Continental Machine & Tool Corporation v. Commissioner. Paul Eghigian and Rose Eghigian v. Commissioner.
Continental Machine & Tool Corp. v. Commissioner
Docket Nos. 79877, 80893.
United States Tax Court
T.C. Memo 1962-96; 1962 Tax Ct. Memo LEXIS 212; 21 T.C.M. (CCH) 517; T.C.M. (RIA) 62096; April 25, 1962
Edgar W. Pugh, Esq., Penobscot Bldg., Detroit, Mich., for the petitioners. John J. Yurow, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: In Docket No. 79877 deficiencies in income tax have been determined by respondent for the taxable years 1953, 1954, and 1955 in the respective amounts of $100,389.77, $889.82, and $5,095.53. In Docket No. 80893 deficiencies in income tax have been determined for the taxable years 1953 and 1954 in the respective amounts of $233,816.53 and $30,541.84. The issues presented *213 are: (1) Is the petitioner in Docket No. 79877, Continental Machine & Tool Corporation, entitled to deductions for net operating loss carryovers from the taxable years 1951 and 1952 to the taxable years 1953 and 1955? (2) Must the petitioner's net operating loss carryover from 1951 to 1953 be limited to $67,723.49, in any event, by reason of additional, unreported, income received in 1952 from cancellations of indebtedness? (3) Did the withdrawals made by Paul Eghigian from B & O Screw Products Company on February 3, 1953, and April 24, 1953, and from Paul's Machinery Company on April 20, 1953, and June 8, 1953, constitute dividend distributions within the meaning of section 115(a) of the 1939 Code? Because of fact stipulations of the parties it is now agreed that there is no deficiency with respect to Continental Machine & Tool Corporation for the year 1954 and that for that year this petitioner sustained a net operating loss in the amount of $2,205.69 and that petitioners Eghigian owe no deficiency in income tax and no overpayment thereof is due them for the year 1954. These agreements will, together with another stipulated adjustment, be evidenced by corresponding adjustments *214 in the computation of tax herein under Rule 50. General Findings of Fact Petitioner Continental Machine & Tool Corporation, sometimes hereinafter referred to as Continental, is a corporation organized and existing under the laws of Michigan. It filed Federal income tax returns for the taxable years 1953, 1954, and 1955 with the director or district director, as the case may be, of internal revenue for the district of Michigan. Petitioners Paul Eghigian and Rose Eghigian are husband and wife residing in Detroit, Michigan. They filed a joint Federal income tax return for the taxable year 1953 with the director of internal revenue for the district of Michigan. Dividena Issue Findings of Fact Petitioner Paul Eghigian, sometimes hereinafter referred to as Eghigian, immigrated to the United States in 1920. In 1924 he went to Detroit where he was employed by the Ford Motor Company for several years. In 1935 he opened a shop in Detroit dealing in used machinery. He operated the shop as a sole proprietorship until 1946 at which time the business was incorporated in the State of Michigan under the name of Paul's Machinery Company, hereinafter referred to as Machinery. At all times *215 material herein he owned 64 percent of the outstanding shares of the corporation. The remaining shares were owned by his wife, petitioner Rose Eghigian, and his two children, John and Helen. From the date of its incorporation until June 1953, he served as president of Machinery. In June 1953, John Eghigian, who had worked in the business for many years, became president, and Eghigian became secretary-treasurer. Eghigian, however, continued to control the policies of Machinery and made all major decisions with respect to the operation of the business. In 1951 Machinery acquired all of the outstanding stock of the B & O Screw Products Company, hereinafter referred to as B & O, a Michigan manufacturing corporation. During its fiscal year beginning May 1, 1952 and ended April 30, 1953, B & O sold most of its machinery and equipment for a total price of $234,285.35. In April 1954, B & O was liquidated and all of its assets were taken over by Machinery. It was the practice of Eghigian to make withdrawals of money from a corporation which he controlled and which had funds it did not presently need and turn the money over to another corporation controlled by him which was in need of the *216 money. The books and records of Machinery show a credit balance on October 31, 1951, of $81,826.47 in the personal account maintained for Eghigian. On November 19, 1952, an indictment was filed in the United States District Court for the Eastern District of Michigan in which Eghigian was charged with having filed with the Bureau of Internal Revenue a false, fictitious, and fraudulent statement regarding his individual income tax liability for prior years. The minutes of a special meeting of the directors of B & O, consisting of Eghigian, his wife Rose, and his son John, held on December 19, 1952, recite that at the meeting Eghigian stated that "from time to time he would need and would like to borrow from the Corporation certain of its funds" and that thereupon a resolution was adopted unanimously authorizing the corporation to lend him such amounts as the corporation could spare from its operating funds provided that in each case he execute to the corporation his note in the amount borrowed, payable on demand and bearing interest at the rate of 4 percent per annum. On January 2, 1953, and February 3, 1953, Eghigian withdrew $50,000 and $78,510.14, respectively, from B & O. The *217 February withdrawal, which was made by him to secure funds for the acquisition of the stock of Bradley-Miller & Company, was evidenced by an unsecured demand note payable to B & O and calling for interest at 4 percent per annum. The amount thereof was originally posted to his personal account on the books of B & O, but on April 30, 1953, was transferred to an account captioned "Notes Receivable." The January withdrawal was originally posted to the notes receivable account. The minutes of a special meeting of the board of directors of Machinery consisting of Eghigian, his wife Rose, and his son John, held on April 22, 1953, recite that at the meeting Eghigian stated that he was indebted in a substantial amount to the United States for income taxes for earlier years; that he preferred to borrow the funds for the payment thereof from other sources than the corporation; that he had attempted to borrow such funds from various banks but a case pending against him in Federal Court had affected his credit standing and he was unable to do so; that he "would like to know if he could borrow from the corporation on a promissory note at a reasonable rate of interest"; and that thereupon a resolution *218 was adopted unanimously authorizing the officers of the corporation to assist him by making him a loan of "$50/100,000," or such other amount as feasible at such rate of interest and for such duration as in their opinion was proper. On April 27, 1953, Eghigian was convicted in the United States District Court for the Eastern District of Michigan on the charge contained in the above-mentioned indictment. Imposition of prison sentence was suspended for 3 years and he was placed on probation for 3 years only on the basis that he make an immediate payment of Federal income taxes for prior years in the amount of $119,472.82. The balance of his liability was to be paid within the calendar year. He was further required to pay a fine of $10,000 within 10 days. On April 24, 1953, Eghigian made a withdrawal of $50,000 from B & O. The amount was posted on the books of B & O to the account captioned "Notes Receivable" and was evidenced by an unsecured demand note calling for interest at 4 percent per annum. On April 20, 1953, he made a withdrawal from Machinery in the amount of $50,000 which was posted to a notes receivable account on the books of Machinery and was evidenced by an unsecured *219 demand note calling for interest at 4 percent per annum. The minutes of a special meeting of the board of directors of Machinery, consisting of Eghigian, his wife, and son, held on June 8, 1953, recite that at that meeting Eghigian stated that he needed an additional amount of $58,116.95 in order to settle his income tax liability and desired to obtain that amount as a loan from the corporation, payable on demand, with interest at the rate of 4 percent per annum and that thereupon a resolution was adopted unanimously authorizing the officers of the corporation to assist him by making him an additional loan of $58,116.95, payable on demand, with interest at the rate of 4 percent per annum. On the same day, June 8, 1953, Eghigian made a withdrawal of $58,116.95 from Machinery which was posted to a notes receivable account on the books of Machinery and was evidenced by an unsecured demand note calling for interest at 4 percent per annum. All of the funds withdrawn from the two corporations in April and June of 1953 were used by Eghigian to pay Federal income taxes, additions to tax for fraud, interest due for the taxable years 1940 through 1945, and to pay the $10,000 fine which *220 had been imposed upon him. Following the execution of the abovementioned notes by Eghigian to B & O and Machinery, the amounts thereof were reflected as assets, either as notes receivable or some other asset, in the balance sheets comprising part of the Federal income tax returns thereafter filed by the respective corporations. In its Federal income tax return for the taxable year ended April 30, 1953, B & O reported net income of $187,055.12 before deducting a net operating loss carryover of $6,984.57 from 1952 and reported a Federal income tax liability in the amount of $47,708.20. On April 30, 1953, B & O had earned surplus in the amount of $123,024.40. In its Federal income tax return for the fiscal year ended June 30, 1953, Machinery reported a loss in the amount of $55,550.36. On June 30, 1953, Machinery had earned surplus in the amount of $403,890.30. When B & O was liquidated in 1954, the amounts appearing in the notes receivable account on its books were transferred to the notes receivable account on the books of Machinery. However, the demand notes executed by Eghigian to B & O were never endorsed over to Machinery. An abstract of Machinery's ledger account maintained *221 for notes receivable discloses the following with respect to notes executed by Eghigian: Due from
Paul Eghigian
On account
Date
Dr.
Cr.
Balance
April 20, 1953
$ 50,000.00
$ 50,000.00
June 8, 1953
58,116.95
108,116.95
March 1954
50,000.00
158,116.95
March 1954
128,510.14
286,627.09
April 1954
$ 10,000.00
276,627.09
October 1954
32,000.00
244,627.09
July 1955
4,116.00
240,511.09
July 1955
10,000.00
230,511.09
July 1955
15,000.00
215,511.09
October 1955
12,000.00
203,511.09
June 1957
22,187.90
225,698.99
June 1957
36,000.00
189,698.99
June 1958
4,259.17
185,439.82
October 1958
469.65
185,909.47
January 1959
500.00
186,409.47
June 1959
8,353.42
194,762.89
June 1959
2,000.00
196,762.89
December 1959
230.68
196,993.57
June 1960
23,000.00
219,993.57
June 1960
83.20
220,076.77
June 1960
3,700.00
216,376.77
July 1960
120,455.00
95,921.77
The first two of the above debits represent the notes executed by Eghigian to Machinery for his withdrawals therefrom on April 20, 1953, and June 8, 1953, in the amounts of $50,000 and $58,116.95, respectively. The *222 third debit represents a note executed by Eghigian to B & O for his withdrawal therefrom on January 2, 1953, in the amount of $50,000, the note having been taken over by Machinery from B & O in the latter's liquidation. The fourth debit, $128,510.14, represents the total of the two notes executed by Eghigian to B & O for his withdrawals therefrom on February 3, 1953, and April 24, 1953, in the amounts of $78,510.14 and $50,000, respectively, and also taken over by Machinery from B & O in the latter's liquidation. The debit of June 1957 in the amount of $22,187.90 resulted from a payment by Machinery to the Internal Revenue Service for Eghigian. The debit of June 1959 in the amount of $2,000 resulted from a payment made by Machinery of state intangible tax for Eghigian. The remaining six debits resulted from payments made by Machinery for Eghigian for undisclosed purposes. Most of the above credits represent the application of dividends and salary paid or credited to Eghigian by Machinery. The credit of June 1958 in the amount of $4,259.17 was made to credit Eghigian for an amount which should have been debited to Continental but which erroneously had been debited to Eghigian. The *223 credits of June and July 1960 in the amounts of $3,700 and $120,455, respectively, resulted from the transfer by Eghigian to Machinery of machinery of an undisclosed type or types and of undisclosed values. No payments were ever endorsed on any of the notes executed by Eghigian to B & O and Machinery. No record is shown to have been maintained showing to which note or notes any payment or credit was applicable or was applied either as interest or principal. Nor is any record shown to have been maintained showing interest accrued on any of the notes. In the joint income tax returns filed by Eghigian and wife for 1953 and 1954 deductions were taken in the amounts of $3,002 and $569.20 as interest paid on undisclosed dates in the respective years to Machinery. The parties are in agreement on brief that the foregoing amounts represented interest paid by Eghigian to Machinery with respect to his above-mentioned withdrawals from it. There is no showing that any further amounts were paid as interest with respect to those withdrawals. Nor is there any showing that any amounts ever were paid as interest with respect to Eghigian's withdrawals from B & O. Machinery declared a dividend in *224 the amount of $15,000 on June 30, 1950. From then until September 30, 1954, no dividends were declared by Machinery although its books show net income before income taxes in the amount of $570,524.41 for the taxable year ended June 30, 1951, and $143,440.39 for the taxable year ended June 30, 1952. On September 30, 1954, Machinery declared a dividend of $50,000. Eghigian's share thereof, in the amount of $32,000 was credited to the notes receivable account. The balance of $18,000 was never paid. On June 30, 1955, Machinery declared a dividend in the amount of $25,000. Of this, $12,000 was credited to the notes receivable account. The balance remains unpaid. From the time of its acquisition by Machinery to the date of its liquidation, B & O never declared a dividend. During 1956, a year in which no payment was made by Eghigian with respect to his above-mentioned withdrawals from B & O and Machinery, a revenue agent began an investigation of his income tax liability for 1953 and 1954. The investigation continued into 1957. In the latter part of 1956 the agent expressed the opinion to Eghigian that his withdrawals from B & O and Machinery in 1953 were dividends rather than loans and *225 stated that in his report he would recommend that they be taxed as dividends. A discussion between the two followed at that time. Thereafter, in June and in August 1957, conferences were held between Eghigian or his representative and the agent or other officials of the Internal Revenue Service as to the liability of the withdrawals as dividends. The statutory notice of deficiency in the case of Eghigian was sent by respondent on March 13, 1959, and the petition with respect thereto was filed on June 10, 1959. In the statutory notice of deficiency issued to Eghigian, the respondent determined that the amounts of $78,510.14 and $50,000 withdrawn from B & O on February 3, 1953, and April 24, 1953, respectively, and the amounts of $50,000 and $58,116.95 withdrawn from Machinery on April 20, 1953, and June 8, 1953, respectively, represented the distribution of taxable dividends to him. Eghigian's withdrawals from B & O on February 3, 1953, and April 24, 1953, and his withdrawals from Machinery on April 20, 1953, and June 8, 1953, were in the nature of dividend distributions and did not represent borrowed money. Opinion The question for determination here is whether Eghigian's *226 withdrawals from B & O in February and April 1953, totaling $128,510.14, and his withdrawals from Machinery in April and June 1953, totaling $108,116.95, were dividends and taxable as such as the respondent determined or were loans by the corporations to Eghigian as the petitioners contend. The question is one of fact to be determined from a consideration of all the evidence relating thereto. Harry E. Wiese, 35 B.T.A. 701 (1937), affd. 93 F. 2d 921 (C.A. 8, 1938), certiorari denied 304 U.S. 562 (1938), rehearing denied 304 U.S. 589 (1938). The character of withdrawals from a corporation by a stockholder thereof depends on the intent of the stockholder making the withdrawals and whether he took the corporation's money for permanent use in lieu of dividends or whether he was only borrowing it. Carl L. White, 17 T.C. 1562 (1952); Al Goodman, Inc., 23 T.C. 288 (1954). Pointing to the minutes of the special meetings of B & O's and Machinery's directors at which the withdrawals in controversy were authorized as loans, to the notes executed by Eghigian for the amounts of the withdrawals, the payments in 1953 *227 and 1954 of interest by him with respect to the withdrawals from Machinery, and the other payments by him as evidenced by credits shown in the abstract of Machinery's ledger account maintained for notes receivable and the other evidence relating to the notes and payments with respect thereto, the petitioners urge that we should conclude that the four withdrawals in controversy were in fact loans. The first two debit items in the abstract, which was placed in evidence by the petitioners and which was prepared by a certified public accountant employed by Machinery, were Eghigian's withdrawals of $50,000 and $58,116.95 on April 20, 1953, and June 8, 1953, respectively, from Machinery. The third debit item in the amount of $50,000 represents his withdrawal on January 2, 1953, from B & O. The fourth debit item in the amount of $128,510.14 represents his withdrawals of $78,510.14 from B & O on February 3, 1953, and his withdrawals of $50,000 from B & O on April 24, 1953. The total of the foregoing five withdrawals is $286,627.09, shown in the abstract as the debit balance at the end of March 1954. The abstract further shows a series of credit items beginning in April 1954. The total of *228 such items through May 1960 is $123,375.17. John Eghigian, who was president of Machinery from June 1958 to the time of the trial herein, when asked on cross-examination if he could "testify as to on which notes the payments were applied," replied, "That I don't know. I don't know which notes the payments would apply to, but I guess the earlier ones were the ones that they'd be applied to." As we understand his statement he was of the opinion that the earliest payment in point of time was to be applied to the note of the earliest date, that subsequent payments were to be applied to that note until paid in full and then applied to the note bearing the next earliest date, and so on with respect to the remainder of the payments and the remainder of the notes. Since the record fails to show that an application was made of any specific payment or credit to any specific note or notes, we will for present purposes regard the payments as having been applicable in the foregoing manner. Since the evidence shows that the abstract does not reflect any item of interest, all debit items will be regarded as principal and all credits shown therein will be regarded as relating to the debit items there *229 shown. Applying the credits according to the foregoing discloses that payment of the principal of Eghigian's note of January 2, 1953, to B & O in the amount of $50,000 was completed by the $10,000 payment in July 1955, with $6,116 of the payment being applicable to Eghigian's note of February 3, 1953, to B & O in the amount of $78,510.14. Applying the $6,116 and the subsequent payments through June 1958, totaling $67,259.17, or a total of $73,375.17 to the note of February 3, 1953, in the amount of $78,510.14, discloses that $5,134.97 of that note remained unpaid at the end of June 1958. Thereafter no payments or credits were made during the period closing with the end of May 1960, a date which was approximately 7 years and 4 months after the date of the note. Such a situation leaves nothing as having been paid to the end of May 1960 on the principal of Eghigian's note of April 24, 1953, to B & O in the amount of $50,000 and nothing on the principal of his notes of April 20, 1953, and June 8, 1953, to Machinery in the amounts of $50,000 and $58,116.95, or a total unpaid amount of $163,251.92 on the four notes. In addition to the foregoing, the abstract shows debits beginning in June *230 1957 and continuing into June 1960 in the total amount of $56,824.85 which represent expenditures made during that period by Machinery in behalf of Eghigian which remained unpaid. Aside from the amounts of $3,002 and $569.20 which the parties agree on brief were paid by Eghigian to Machinery in 1953 and 1954, respectively, as interest on the withdrawals he made from it on April 20, 1953, and June 8, 1953, there is no showing that he has ever paid any interest on any of the notes he executed to B & O or to Machinery. Having received the foregoing amounts Machinery presumably reported them as income in the respective years of receipt. However, respecting the remainder of the interest accruing on the foregoing notes and the notes executed to B & O, there is no showing that either B & O or Machinery accrued on its books and reported as income in any year any amount or amounts with respect to the notes Eghigian executed to them. Such is the situation even though the minutes of the meetings of the directors of both B & O and Machinery state that the authorization of Eghigian's withdrawals therefrom required his execution to them of interest-bearing notes therefor and even though as the *231 petitioners state on brief he had noncash assets of a total of more than $1,150,000. To use the language of the petitioners on brief, Eghigian "was the 'brains' of" both B & O and Machinery, which also owned all of the stock of B & O. As a consequence, his freedom to continue in the active management of the corporations was not only important to the corporations but was desirable to him. The payment of his Federal income taxes, additions to tax, and interest for prior years as well as his fine was an important factor in enabling him to obtain a suspension for 3 years of the imposition of a prison sentence and to be placed on probation for a like period. Eghigian's withdrawal from B & O in April 1953 and his withdrawals from Machinery in April and June 1953 enabled him to make such payment. Respecting repayment of the withdrawals, the abstract shows that in 1954 and 1955, years during which he was on probation, he made a number of payments, totaling $83,116, which were applicable to the principal amounts of his withdrawals from B & O in January and February 1953. In 1956, the year in which his probation expired, no payments were made by him. No further payment was made until in June *232 1957 when $36,000 was paid. That payment followed an investigation of his income tax liability for 1953 and 1954 during which the revenue agent making the investigation expressed an opinion to Eghigian that the withdrawals from B & O and Machinery were taxable as dividends and stated that he would make a recommendation accordingly in his report. That payment likewise preceded a second conference held in August 1957 about the matter. No further payments or credits were made as shown by the abstract until June 1960. However, in the meantime the respondent, on March 13, 1959, had sent to Eghigian the notice of deficiency involved herein in which he determined that Eghigian's withdrawals from B & O in February 1953 and April 1953 and his withdrawals from Machinery in April 1953 and June 1953 represented the distribution of taxable dividends and Eghigian had filed the petition involved herein on June 10, 1959. The credit of June 1960 in the amount of $3,700 and that of July 1960 of $120,455, shown in the abstract, were for machinery of an undisclosed type or types and of undisclosed values transferred by Eghigian to Machinery. The machinery involved in the June 1960 credit is described *233 in the record as having been purchased from Eghigian and that involved in the July credit is described as having been purchased from him "as of December 31, 1959." As has often been pointed out, transactions between a corporation and a stockholder therein who is in control of it are, on account of the parties thereto, not arm's length transactions between strangers and consequently are subject to careful examination to ascertain whether they may constitute the equivalent of arm's length transactions. The record here, however, due to the lack of evidence relating to the machinery transactions, precludes our making such an examination. In addition to what has just been said respecting the machinery transactions, we think the following statement in Taylor Securities, Inc., 40 B.T.A. 696, 703 (1939), is applicable here: The petitioner cites no provision of law or decision, nor are we aware of any, which authorizes a taxpayer, subsequent to the respondent's determination, to enter upon a course of conduct which will materialize into the happening of a fact or set of facts that will operate in and of themselves to nullify the respondent's determination. Such an authorization *234 would reduce the administration of the tax laws to mere idle activity. * * * From our consideration of all the evidence of record bearing on the question, we are of the opinion and have so found as a fact that Eghigian's withdrawals from B & O on February 3, 1953, and April 24, 1953, and his withdrawals from Machinery on April 20, 1953, and June 8, 1953, were in the nature of dividend distributions and did not represent borrowed money. The respondent is sustained as to this issue. Continental Issue Findings of Fact Petitioner Continental Machine & Tool Corporation was incorporated in 1946 under the name Bradley-Miller & Company. Under its original Articles of Incorporation, it was empowered to conduct a general woodworking business, including the manufacture of doors, sash frames for doors and windows, boxes and crates, and other articles manufactured from wood. Its registered office and place of business were in Bay City, Michigan. During the period extending from 1948 through the early part of 1952, Bradley-Miller's business consisted primarily of the manufacture of door and window sash frames and the manufacture of ammunition boxes under Government contract. Both of these *235 operations were conducted in the Bradley-Miller plant in Bay City, Michigan. Largely as the result of heavy losses suffered in connection with the contracts for the manufacture of ammunition boxes, Bradley-Miller sustained business losses in the taxable years 1951 and 1952 in the amounts of $166,977.98 and $79,777.47, respectively. Work was completed on the Government contracts about April 1, 1952. After that, the operations of the plant were drastically reduced. In November 1952, Bradley-Miller was insolvent and completely unable to meet its obligations. Its only assets were its plant in Bay City, the real estate on which it was located, the machinery and equipment contained therein, and accounts receivable of approximately $15,000, which were pledged as security for a bank note in the approximate amount of $10,000. The book value of its fixed assets was $241,689.72. The plant was subject to a mortgage on which approximately $42,000 was then owing. Some of the machinery had been purchased on a conditional sales contract having a balance due in the approximate amount of $25,000. Both the mortgage and conditional sales contract were in default. Unsecured notes and accounts payable *236 to general creditors totaled $130,930.05, including $67,655.38 due to the Thomas S. Dennis Company of Kansas City for lumber furnished in connection with the Government contract and $17,500 due to B. J. Tally, a Bay City attorney, for legal services. In addition, Bradley-Miller was indebted to its officers and stockholders in the amount of $50,720.51. The Bradley-Miller plant was located on approximately 3 acres of land situated on the Saginaw River in Bay City, Michigan. The improvements consisted of a main plant, approximately 300 feet long, 100 feet wide, and 2 1/2 stories high, and two smaller buildings which were used for storage and office space. The main plaint or mill was of wood frame construction. Most of the machinery contained in the mill was old and obsolescent although there were a few pieces of relatively new and modern woodworking machinery. Tally and Dennis acquired all of the outstanding stock of Bradley-Miller on December 31, 1952, in consideration of their agreement to hold harmless the prior stockholders from any claims resulting from their stockholdings therein. The prior stockholders also canceled and forgave indebtedness due them collectively from the corporation *237 in the amount of $50,720.51. During the years 1951 and 1952, Eghigian, in partnership with his wife Rose, had operated a profitable tool and die business in Flint, Michigan, under the name Sampson Die & Manufacturing Company. Sampson filed a Federal partnership return for the taxable year ended February 28, 1953, showing ordinary net income in the amount of $129,065.02. Eghigian learned that Bradley-Miller was for sale by Tally and Dennis. He immediately began negotiations looking toward the purchase of all of its stock. He engaged the services of an accountant and an attorney to make the necessary financial investigation of Bradley-Miller, including the reality of its claimed losses in prior years, and to investigate the legal aspects of Tally's and Dennis' title and ownership of its stock, the existence or nonexistence of claims against it, the necessary formalities of transfer of the stock, and the tax effect of the losses with respect to the income of an acquiring taxpayer. On or about January 26, 1953, he made an offer to purchase all of the stock of Bradley-Miller, with assets, for $125,000 or without assets for $35,000. In either case the corporation was to be free and clear *238 of all liabilities. Eghigian was at no time interested in purchasing the Bradley-Miller assets without its stock being included. After further negotiation, on January 30, 1953, he succeeded in purchasing the stock for $155,000 with the assets free of all encumbrance. During the sales transaction Eghigian sought to obtain from Tally and Dennis a written guarantee that a tax benefit could be obtained upon his acquisition of the Bradley-Miller stock by the use of the losses of that corporation during prior years. Such a guarantee was refused. On February 13, 1953, a certificate of amendment to the Articles of Incorporation of Bradley-Miller was filed with the Michigan Corporation and Securities Commission, changing the name of the corporation to Continental Machine & Tool Corporation, amending the purpose clause to permit the corporation to carry on a tool and die manufacturing business, and changing the registered and the post office address of the corporation to Flint, Michigan. Immediately after the stock in Bradley-Miller was purchased by Eghigian, the following officers were elected: President
Paul Eghigian
Vice President
John Eghigian (Paul's son)
Secretary
Donald Edwards
Treasurer
Rose Eghigian (Paul's wife)
*239 Shortly thereafter the assets of Sampson were entered on the books of Continental at book value as follows: Furniture and fixtures
$ 4,735.18
Machinery and equip-
ment
405,838.65
Small tools
3,674.38
Truck
950.00
Mortgage Payable - Paul Eghigian
$415,198.21
Cash advanced
$ 20,000.00
Petty cash fund and pay-
roll account
2,650.00
Prepaid insurance
3,332.25
Payroll advanced
42,117.97
Inventories
40,715.68
Note Payable - Paul Eghigian
$108,815.90 The cash advances came from Eghigian's personal funds. Thereafter, the tool and die manufacturing business formerly conducted by Sampson was continued by Continental. For the taxable years 1953, 1954, and 1955, Continental had the following income and expenses: 1953
1954
1955
Gross sales
$923,324.03
$473,038.43
$109,441.22
Less: Cost of goods sold
389,658.63
297,873.82
72,599.72
Gross profit
$533,665.40
$175,164.61
$ 36,841.50
Capital gains
69,617.57
58,926.72
Other income
3,286.12
2,114.86
5,171.76
Total income
$606,569.09
$177,279.47
$100,939.98
Less: Expenses
438,209.10
179,485.16
83,954.89
Taxable income before net operating loss
deduction
$168,359.99
$ (2,205.69)
$ 16,985.09
*240 All the income, with the exception of $176 in 1953, was derived from the operation by Continental of the tool and die business in Flint, Michigan. Expenses in the amounts of $28,643.40, $30,189.85, and $4,993.85, respectively, are attributable to the Bay City plant. After acquiring the stock of Bradley-Miller, Eghigian engaged Alexander Lush, a building contractor, and Preston Marshall, an engineer and ex-naval officer, to investigate the possibility of putting the Bay City plant to profitable use. Lush's primary studies were directed toward determining whether the wood frame business could be profitably conducted. He also studied the possibility of manufacturing aluminum frames. Marshall was primarily interested in reviving the ammunition box business formerly conducted by Bradley-Miller. The principal reasons for Bradley-Miller's failure in the frame business were: (1) that raw materials, which at one time were close at hand, had to be obtained from the West Coast, increasing freight costs to such an extent that a competitive product could not be manufactured; and (2) the widespread use of aluminum sash which obviated the need for frames. The box business suffered from the *241 need to compete with southern mills which could manufacture boxes at a considerably smaller cost than could mills located in Michigan. At the time Bradley-Miller's stock passed to Eghigian, there was no reasonable business possibility that the Bay City plant could be profitably operated either in the manufacture of wood products, tools, and dies, or the metal parts then being manufactured by Sampson. Approximately 75 percent of the machinery contained in the Bay City plant was usable only for woodworking. The remainder could have been retooled for other manufacturing operations. The conversion of the Bay City plant to a metal working operation would have required the use of 7 feet of fill to bolster sagging foundations, the installation of concrete fioors, the acquisition of additional machinery, and the retooling of those machines already located in the plant that could be converted to metal working. The conversion would have required 8 months to a year and an outlay of approximately $200,000. In August of 1953, the mill, together with all of the machinery and equipment located therein, was completely destroyed in a fire. By that time, some work had been done to rehabilitate the *242 sagging foundations, repair the roof and clean the machinery. No manufacturing operations of any kind had been commenced. Thereafter, Continental made use of the auxiliary building or shed to manufacture concrete slabs for use in the construction of houses. Continental did not own any of the equipment necessary for the manufacture of concrete slabs at the time its stock was acquired by Eghigian. The necessary equipment, including a mixer, shaker, screener, and hopper, was purchased in Detroit for approximately $4,000 after the main plant burned down. On its Federal income tax returns for the taxable years 1953 and 1955, Continental claimed net operating loss deductions in amounts sufficient to offset completely reported net or taxable income for those years. The claimed net operating loss deductions resulted from carryovers from the taxable years 1951 and 1952. In the statutory notice of deficiency respondent determined that no net operating loss deductions were allowable under the applicable provisions of the Internal Revenue Codes of 1939 and 1954. Respondent further determined that, in any event, the net operating loss carryover to the taxable year 1953 does not exceed $46,545.69 *243 computed as follows: December 31, 1952, net operating
loss as reported
[79,777.47)
Add: Income realized by cancel-
lation of indebtedness
200,209.76
Net income before net operating
loss deduction
$120,432.29
Deduct: Net operating loss carry-
over from 1951
(166,977.98)
Carryover to year ended Decem-
ber 31, 1953
[46,545.69)
Eghigian's principal purpose in acquiring control of Bradley-Miller was evasion or avoidance of Federal income tax by securing to himself, as sole shareholder, the benefit of net operating loss deductions which he would not otherwise have enjoyed. Opinion Section 129(a) of the Internal Revenue Code of 1939 provides as follows: If * * * any person or persons acquire, on or after October 8, 1940, directly or indirectly, control of a corporation * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income or excess profits tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. * * * Its corresponding section of the 1954 Code is, in *244 the above respect, the same. It follows then that the issue whether Continental may properly carry over to its taxable years 1953 and 1955 the business operating losses of Bradley-Miller for 1951 and 1952 is one of fact, i.e., whether Eghigian's acquisition of the stock of Bradley-Miller in 1953 was principally for the purpose of evading or avoiding Federal income or excess profits tax upon the income of Continental by securing to the latter the operating loss deductions of the former. We think this record amply supports a holding in the affirmative as we have concluded in our findings and that such holding is dispositive of this issue. Sampson was, prior to and during the years at issue, a growing business, manufacturing jet engine and tank parts for the United States under contract. Through Eghigian, a partner therein and its controlling spirit, pressure was continuous for expansion of its manufacturing facility in order that it might produce a greater number of such parts. Its taxable profits were correspondingly high and the prospects were that they would become higher because the increasing demands had been at least partially met by increased manufacturing plant. Eghigian, *245 as a controlling partner in Sampson, was necessarily becoming personally liable for increasing amounts of Federal tax. In this situation it would be reasonable to expect an effort on his part to lessen such liability. Within a period of less than one month, he negotiated for and purchased in January of 1953 all of the outstanding stock of Bradley-Miller with its assets free and clear of all encumbrance, but only after becoming as certain as possible of the existence and genuineness of its losses and the legality of the use of such losses as deductions against the taxable income of the business then being conducted by Sampson. Virtually immediately Bradley-Miller's name was changed to Continental and its articles amended to authorize the conduct of the same business as that conducted by Sampson. At the same time, Sampson's assets were transferred to Continental for its stock which was issued to Eghigian. Also, the fixed assets of Bradley-Miller were transferred to Continental at their Bradley-Miller book value with a corresponding mortgage indebtedness to Eghigian personally noted on the books of Continental. The home office of Continental was designated as the same address as that *246 of Sampson and its affairs were thereafter conducted from there. The business formerly conducted there by Sampson was thereafter conducted by Continental without change. Eghigian testified and argues on brief that the principal reason for his acquisition of the stock of Bradley-Miller was to satisfy the Government's increasing demand for expansion of Sampon's plant facility. For several reasons we are not impressed with this contention. Probably the most significant is the fact that the Bradley-Miller plant was not designed or equipped to perform the manufacturing being carried on by Sampson. Bradley-Miller was a woodworking plant while Sampson was a tool and die plant engaged in the manufacturing of metallic machine parts. The Bradley-Miller plant building was at least 70 years old with obsolescent machinery, except for a few modern nailing machines. The only possible function it could have performed which had any significance to the work of Sampson was the fabrication of shipping boxes and cases wherein it would be possible to ship Sampson's products. The Bradley-Miller plant was never used for this purpose and, in fact, was never placed in operation after Eghigian acquired the *247 stock of the corporation. To rehabilitate the plant sufficiently for operation would have required the expenditure of approximately $200,000 and a period of nearly a year. In no event could it have provided any immediate or real aid in the carrying on of the business being conducted by Sampson. If Eghigian is to be believed, it would reasonably be expected that in his negotiations with respect to Bradley-Miller his primary concern would have been its operating assets; yet the record clearly indicates his primary concern with its stock. He would have purchased the corporate shell had Tally and Dennis been willing to sell the stock sans assets. The Bradley-Miller plant or the larger portion of it was destroyed by fire in August of 1953. Thereafter a shed was used to produce concrete slabs for building construction. This is the only use made of the Bradley-Miller plant and Eghigian's expressed reason for such use is revealing. It was: When we bought the Bay City [Bradley-Miller] plant, what were we going to do? We have to do something. Paying taxes for nothing. We had to do something." We are justified in concluding that at the time of his acquisition of the Bradley-Miller stock Eghigian *248 had no intention of operating the plant. The record amply supports the conclusion that in January of 1953 Eghigian acquired direct control of Bradley-Miller for the principal purpose of obtaining the right to deduct that corporation's losses for 1951 and 1952 from the income of Continental for the years 1953 and 1955. Therefore respondent's determination that such losses may not be deducted because of the provisions of section 129(a) of the 1939 Code and section 269 of the 1954 Code is sustained. Decisions will be entered under Rule 50.